**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael L. Ruiz, | No. CV-23-02090-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Magellan Financial & Insurance Services, | |
| Defendant. | |

In this action under Title VII and 42 U.S.C. § 1981, Plaintiff Michael L. Ruiz ("Ruiz") sues his former employer, Defendant Magellan Financial & Insurance Services ("Magellan"), under the theory that his alleged demotion (or demotions) and termination were due to his race and national origin and that he was also subjected to a hostile work environment.

Now pending before the Court is Magellan's motion for summary judgment. Although the tentative ruling issued before oral argument concluded that Magellan's motion should be granted, the Court now concludes, with the benefit of oral argument, that the motion should be largely denied.[1]

## BACKGROUND

I.    Relevant Factual Background

The following facts are derived from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless otherwise noted.

---

[1]    Given this outcome, the Court will address Magellan's motion to exclude the opinions of Ruiz's damages expert, Michael Stokes, by separate order.

Ruiz has "Mexican heritage." (Doc. 61-1 at 6 ¶ 13. *See also* Doc. 55 at 20 ["Q: Why would you refer to yourself as the 'Chief Mexican Officer' when you were born and raised in the United States? A: Because my heritage is Mexican."].)

In April 2004, Magellan hired Ruiz. (Doc. 1 at 3 ¶ 7; Doc. 9 ¶ 7.) Ruiz performed a variety of functions for Magellan over time, including serving as a media designer; providing various information technology ("IT") services; marketing Magellan to insurance advisors; hiring video producers, copywriters, and graphic designers; building a commission database; and eventually acting as a client liaison for the account of Dr. David Mortach ("Mortach"). (Doc. 55 at 44; Doc. 61-1 at 4 ¶¶ 3-7.)

At some point before 2019, Ruiz became friends with Magellan's CEO Bryon Rice ("Rice"). (Doc. 55 at 38.) At one point, Rice loaned Ruiz roughly $10,000 at a "very low" interest rate to buy a vehicle. (*Id.* at 35-36.) Between 2005 and 2006, Rice also allowed Ruiz to live in his second home at no charge and covered the utilities. (*Id.* at 30, 36-37.) Around roughly the same time, Rice took Ruiz on a fishing trip to Alaska at Rice's expense. (*Id.* at 31-32.) They also attended concerts together (along with other co-workers) at Rice's expense. (*Id.* at 37.)

In March 2021, Magellan hired Randall Witte ("Witte"). (*Id.* at 24.) Ruiz made the hiring decision, which he contends Magellan forced him to make. (Doc. 61-1 at 6 ¶ 14 [Ruiz, describing Witte as "the white male Magellan had me hire"].) Witte was initially hired as a graphic designer under Ruiz's supervision, but Witte was later promoted to the positions of creative director (in or around June/July 2021), director of marketing (at some unspecified later point in 2021), and finally vice president of marketing (in December 2023). (*Id.* at 48-59.)

Also in March 2021, Ruiz had an altercation with Magellan's President, Jarrod Florence ("Florence"), arising out of a disagreement regarding a proposal by Ruiz to use robotic cameras to cut costs. (*Id.* at 5 ¶¶ 8-10.) In response, Ruiz quit working for Magellan. (Doc. 1 at 3 ¶ 7; Doc. 9 ¶ 7; Doc. 55 at 21-22; Doc. 61-1 at 5 ¶ 10.)

In April 2021, about two weeks later, Magellan rehired Ruiz. (Doc. 1 at 3 ¶ 7; Doc.

9 ¶ 7; Doc. 55 at 70 ["In April of 2021, when I came back . . . ."]; Doc. 61-1 at 58 ["I believe he had been rehired within a two-week period . . . ."].)  Ruiz's new job responsibilities following his rehiring included handling the account of Mortach, an "important" client.  (Doc. 55 at 44, 80.)  However, for reasons that are disputed, Mortach eventually stopped providing work to Ruiz.  (Doc. 55 at 51-52, 80; Doc. 61-1 at 7 ¶ 20.)

In February 2023,[2] Magellan terminated Ruiz's employment.  According to Ruiz, Rice's stated reason for the termination decision was that there was "no work" for him.  (Doc. 55 at 70.  *See also* Doc. 61-1 at 10 ¶ 6 ["Magellan told my husband that they did not have any need for him anymore . . . ."].)

II.    Procedural Background

On March 5, 2023, Ruiz filed a charge of discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC").  (Doc. 55 at 70.)  The Charge alleged discrimination on the basis of race and national origin and indicated that the discrimination took place between November 2022 and February 1, 2023.  (*Id.*)  Ruiz did not check the box to indicate it was a "continuing action."  (*Id.*)  In the "particulars" section of the Charge, Ruiz wrote the following description of the events:

- Respondent first hired me in April of 2004.  I worked my way up to Director of Marketing.  In March of 2021, Magellan's President, J[a]rrod Florence, threatened to physically fight me, so I quit.  In April of 2021, I was hired back by Bryon Rice, CEO.

- Before I quit, on March 3, 2021, Respondent had me hire Caucasian individual, Randall Witt[e].  In April of 2021, when I came back, Respondent had me train Witt[e] in my job responsibilities.  Witt[e] was to receive $45k per year to do graphics.  In March of 2021, I was told Witt[e] was given a significant raise and was promoted to my position Director of Marketing.  Throughout my tenure CEO Rice would say demeaning things to me like, "I don't know what I am paying you for" and "You are costing the Company money."

- In November of 2022, I was essentially demoted to be Rice's personal errand

---

[2]    Although the complaint and EEOC charge identify February 1, 2023 as the termination date (Doc. 1 at 5 ¶ 14; Doc. 55 at 70), Ruiz's declaration and motion papers assert that the termination date was February 23, 2023 (Doc. 61 at 2; Doc. 61-1 at 7 ¶ 19).  The precise date in February is immaterial to the summary judgment analysis.

boy. On December 8, 2022, Rice had me buy tickets for the Red Hot Chili Peppers. On January 17, 2023, Rice had me create a calendar to ridicule an employee. On January 26 of 2023, I was told to resell tickets on Ticketmaster. I no longer had any of my previous responsibilities of graphic design, video production, and all my marketing responsibilities for which I was hired.

- On February 1, 2023, Bryon Rice called me to tell me that I was fired. Rice claimed he had no work for me. Two days after I was fired, Respondent posted my job with a salary of $150k to $200k per year. I was only paid 95k. The real reason I was fired is because of my race and national origin. Rice repeatedly told me that Magellan's white agents would not want to report to me because I am Mexican American.

- When I was fired, Respondent denied me my fourth quarter bonus. Other, non-Mexican Americans were given their fourth quarter bonuses, but I was denied the bonus even though I earned it.

- I believe I have been discriminated against in violation of Title VII because of my race and national origin.

(*Id.*)

On October 5, 2023, Ruiz filed the complaint. (Doc. 1.) The complaint asserts five causes of action: (1) demotion based on race/national origin, in violation of 42 U.S.C. § 1981; (2) wrongful termination based on race/national origin, in violation of § 1981; (3) hostile work environment based on race/national origin, in violation of § 1981; (4) demotion based on race/national origin, in violation of Title VII; and (5) wrongful termination based on race/national origin, in violation of Title VII. (*Id.* at 6-8.)

On October 25, 2024, Magellan filed the motion for summary judgment. (Doc. 55.)

On December 10, 2024, the motion became fully briefed. (Docs. 61, 62.)

On June 3, 2025, the Court issued a tentative ruling. (Doc. 65.)

On June 23, 2025, the Court heard oral argument. (Doc. 66.)

## DISCUSSION

### I. Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  *See also Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

II.    Exhaustion And Timeliness

    A.    **The Parties' Arguments**

Magellan invokes the doctrine of administrative exhaustion to argue that Ruiz's Title VII claims in Counts Four and Five must be limited to the timeframe detailed in the Charge, which is the four-month period between November 2022 and February 1, 2023.

(Doc. 55 at 5-6.)  Magellan also argues that the relevant statute of limitations for demotion claims under § 1981 is two years, and therefore none of the alleged discriminatory conduct that occurred more than two years before the filing of this action (*i.e.*, before February 2022) can be considered.  (*Id.* at 6-8.)  Magellan further argues that although Ruiz's other § 1981 claims—the claims for wrongful termination and hostile work environment in Counts Two and Three—are subject to a four-year statute of limitations, many of Ruiz's factual allegations arise outside this period and thus cannot support Ruiz's claims.  (*Id.*)

In response, Ruiz argues that his Title VII claims in Counts Four and Five are not restricted to the four-month period between November 2022 and February 2023 because the Charge also referenced the 2021 altercation with Florence, thereby putting Magellan on notice that such conduct would form part of his claim.  (Doc. 61 at 14-15.)  Ruiz further argues that although he failed to check the box indicating a "continuing violation" theory of discrimination, he nevertheless alleged a pattern of discriminatory acts sufficient to establish a continuing violation.  (*Id.* at 15.)  Ruiz also argues that the relevant limitations period for all of his § 1981 claims—including his demotion claim in Count One—is four years and that he has alleged a demotion beginning in March 2021, well within the four-year statutory period.  (*Id.* at 13-14.)

In reply, Magellan contends that Ruiz's continuing violation theory "falls well short of the standard" because the pre-2022 conduct is not "reasonably related to the events charged" but rather "merely refer[s] to background information."  (Doc. 62 at 8.)  Magellan also reiterates that the § 1981 demotion claim in Count One is subject to a two-year statute of limitations and argues that Ruiz, by admitting in his response that the first demotion occurred in March 2021, has thus admitted that any claim premised on that demotion is time-barred.  (*Id.* at 7.)  Magellan concedes that the other § 1981 claims—the wrongful termination and hostile work environment claims in Counts Two and Three—are not time barred but contends they should be "limited to alleged incidents that occurred on or after October 5, 2019—four years prior to the filing of this action."  (*Id.*)

…

B.    **Analysis**

1.    Title VII Exhaustion

"As a precondition to the commencement of a Title VII action in court, a complainant must first file a charge with the Equal Employment Opportunity Commission."    *Fort Bend Cty., Tex. v. Davis*, 587 U.S. 541, 543 (2019).    This "nonjurisdictional claim-processing rule[]" is "mandatory in the sense that a court must enforce the rule if a party properly raises it."    *Id.* at 548-49 (2019) (cleaned up).

In Arizona, the deadline for a complainant to file a claim with the EEOC is extended from the ordinary 180 days to 300 days if the complainant first initiates proceedings with the state agency.    *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. §§ 623(d)(1), 633(b). Additionally, "where, like here, the ACRD and EEOC are parties to a worksharing agreement, a complainant ordinarily need not file separately with federal and state agencies."    *Cox v. Glob. Tool Supply LLC*, 629 F. Supp. 3d 963, 971 n.2 (D. Ariz. 2022) (internal quotations omitted).    *See also Fort Bend Cnty.*, 587 U.S. at 544 ("If the state or local agency has a 'worksharing' agreement with the EEOC, a complainant ordinarily need not file separately with federal and state agencies.").

Here, Ruiz filed the Charge on March 5, 2023.    This was fewer than 300 days after the alleged demotion in November 2022 and fewer than 300 days after the alleged termination in February 2023.    However, to the extent Ruiz contends he was also subjected to a separate, earlier demotion that began in March 2021—a theory that also fails for additional reasons discussed in later portions of this order—any Title VII claim premised on that demotion is barred because it occurred more than 300 days before Plaintiff filed the Charge.    With that said, Ruiz may still use evidence of discriminatory conduct occurring more than 300 days before he filed the Charge, and/or that occurred before the November 2022 date that Ruiz identified in the Charge as the starting point for the conduct being challenged, to prove discriminatory animus in support of his Title VII claims.    *Lyons v. England*, 307 F.3d 1092, 1110 (9th Cir. 2002) ("In the context of a racial disparate treatment claim, [relevant background evidence may be used] to determine the ultimate

question: whether . . . the defendant intentionally discriminated against [the plaintiff] because of his race.") (cleaned up). *See generally Bond v. Wells Fargo Bank NA*, 2025 WL 1043402, *7 (D. Ariz. 2025) ("[A]t least in disparate-treatment cases, a plaintiff should be permitted to plead time-barred discriminatory acts to help establish a prima facie case.") (citations omitted).

### 2.    Timeliness Of Demotion Claim Under § 1981

"Unlike Title VII claims, though, Section 1981 claims are not subject to administrative exhaustion." *Oliver v. Iron Workers Union Local 229*, 2019 WL 506600, *3 (S.D. Cal. 2019). Thus, Magellan identifies a different reason why Ruiz's demotion claim in Count One should be dismissed or limited—the statute of limitations.

For claims under 42 U.S.C. § 1981, the statute of limitations is either two years (if the action existed in law before December 1, 1990) or four years (if the action arose under an Act of Congress enacted after December 1, 1990). *Fisher v. Glendale Elementary Sch. Dist.*, 2017 WL 1787565, *4 (D. Ariz. 2017). *See also Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Although Magellan asserts in its motion that "[d]emotion . . . claims existed under § 1981 prior to the passage of the Civil Rights Act of 1991" (Doc. 55 at 7), Magellan does not cite any authority in support of this assertion. The Court's independent research suggests the law is to the contrary. *See, e.g.*, *Sheibani v. Georgia Power Co.*, 1991 WL 127074, *1-2 (N.D. Ga. 1991) (agreeing with the defendant "that a claim of discriminatory demotion under 42 U.S.C. § 1981 is not viable after" *Patterson v. McLean Credit Union*, 491 U.S. (1989), and noting that "although the Eleventh Circuit has not addressed the issue of whether demotion claims are actionable under Section 1981, the majority of courts in other districts has resolved this issue by dismissing Section 1981 discriminatory demotion claims"); *Newton v. A.B. Dick Co.*, 738 F. Supp. 952, 955 (D. Md. 1990) ("Although I am not aware of any court in the Fourth Circuit having addressed the issue, district courts elsewhere have held that discrimination in demotions is no longer actionable under § 1981. . . . [A]n alleged discriminatory demotion, evil though such an action is, does not involve discrimination in the enforcement of contracts, nor does it

implicate any impediment to access to the legal process to enforce contractual rights. Therefore, discrimination in demotions does not fall within § 1981.").  *See generally CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 449-51 (2008) (noting that *Patterson* "significantly limited the scope of § 1981" by "excluding from its scope . . . post-contract-formation conduct"; that "in 1991, Congress enacted legislation that superseded *Patterson* and explicitly defined the scope of § 1981 to include post-contract-formation conduct"; and that an accompanying House Report to the 1991 law clarified that the new law included "protections . . . [that] would include . . . demotion") (cleaned up).[3]

Accordingly, to the extent Ruiz contends he was subjected to two distinct discriminatory demotions—one beginning in March 2021 and another occurring in November 2022—Ruiz is not time-barred from premising his § 1981-based discriminatory demotion claim in Count One on both of those demotions (whereas he is limited, for purposes of his Title VII-based discriminatory demotion claim in Count Four, to seeking relief based on the alleged November 2022 demotion).

### 3. Timeliness Of Wrongful Termination Claim Under § 1981

Wrongful termination claims were also made possible by the 1991 Civil Rights Act and therefore are also subject to a four-year limitations period.  *Jones*, 541 U.S. at 382. The parties agree on this point.  (Doc. 55 at 7; Doc. 61 at 13.)  Ruiz's § 1981-based wrongful termination claim in Count Two, which is based on his termination in February 2023, is thus not time-barred.  Moreover, to the extent Magellan argues that evidence of other discriminatory conduct that occurred more than four years before the filing of this action is time-barred, that argument is unavailing for the reasons discussed above.  *Lyons*, 307 F.3d at 1110; *Bond*, 2025 WL 1043402 at *7.

…

…

---

[3]    This timeliness analysis was also set forth in the tentative ruling issued before oral argument.  During oral argument, Magellan's counsel stated that he "agree[d] with the Court's analysis so to the extent necessary, [he] would withdraw the assertion in the motion and rely on the Court's analysis."  For that additional reason, the Court concludes that no portion of Count One is time-barred.

III.    Merits

Discrimination based on "ancestry or ethnic characteristics" falls within the "racial discrimination that Congress intended § 1981 to forbid." *St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987). Although national origin discrimination is not within the ambit of § 1981, race has been defined broadly to cover immigrant ethnic groups. *Manatt v. Bank of Am.*, NA, 339 F.3d 792, 798 (9th Cir. 2003). Similarly, under Title VII, employers may not discriminate on the basis of an employee's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

"Analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case." *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 850 (9th Cir. 2004). In both contexts, "[t]he *prima facie* case may be based either on a presumption arising from the factors . . . set forth in [*McDonnell Douglas*] or by more direct evidence of discriminatory intent." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). *See also Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148-49 (9th Cir. 1997) ("A plaintiff can also establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test, if she provides evidence suggesting that the employment decision was based on a discriminatory criterion illegal under the Civil Rights Act.") (cleaned up).

Under the *McDonnell Douglas* framework, a plaintiff may establish a prima facie case of discrimination by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Fonseca*, 374 F.3d at 847. "The requisite degree of proof necessary to establish a *prima facie* case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889.

If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly

discriminatory conduct.  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003).  If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.  *Id.*

"A plaintiff may meet the burden to show pretext using either direct or circumstantial evidence."  *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005).  "Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption."  *Id.* at 1095 (cleaned up).  "Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate discrimination.  It can take two forms.  First, the plaintiff can make an affirmative case that the employer is biased . . . .  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is 'unworthy of credence.'"  *Id.* (citation omitted).  The distinction between direct and circumstantial evidence "controls the amount of evidence that the plaintiff must present in order to defeat the employer's motion for summary judgment."  *Id.*  "[T]he plaintiff need offer very little direct evidence to raise a genuine issue of material fact," whereas circumstantial evidence "must be specific and substantial to defeat the employer's motion for summary judgment."  *Id.* (cleaned up).

Here, Magellan does not dispute that Ruiz is a member of a protected class or that he was qualified for the position.  Magellan disputes, however, whether Ruiz can satisfy the other elements of his claims.

### A.    **Demotion Claims**

#### 1.    The Parties' Arguments

Magellan argues that Ruiz "was never 'demoted.'  He did not have a change of job title.  He did not have a reduction in salary.  His role at Magellan had always been to perform various tasks to fill the gaps as needed and directed by Mr. Rice.  The only change during this time period is that an important Magellan client, [Mortach], asked to no longer work with [Ruiz], because [Mortach] was not satisfied with [Ruiz's] client services.  This was a decision by [Mortach], and was not a 'demotion' by Magellan."  (Doc. 55 at 8.)

Additionally or alternatively, Magellan argues that Ruiz "has not identified similarly situated individuals outside his protected class that were treated more favorably, or other facts that would support an inference of discrimination" because "Witte . . . was and is not similarly situated. He was hired by [Ruiz] himself, at less than half of [Ruiz's] own salary, in a position not held by [Ruiz] . . . [and] perform[ing] duties never performed by [Ruiz]." (*Id.* at 8-9.) Magellan further argues that Ruiz's claims of racially insensitive language over the course of his employment serve as "at best weak circumstantial evidence of discriminatory animus," especially given the testimony of Ruiz's wife, Brandi Ruiz ("Brandi"), that Ruiz "never spoke with her about claimed comments during his long tenure with Magellan" and Ruiz's own use of "racially insensitive language" describing himself. (*Id.* at 9.)

In response, Ruiz argues that he has provided sufficient evidence that "Magellan demoted [him] when it rehired him after the altercation with Florence and again in November of 2022." (Doc. 61 at 10.) Ruiz contends he has proffered four pieces of evidence to demonstrate that he once held the position of "Director of Marketing"—(1) a 2016 text from Rice approving his selection for that position; (2) a company badge purporting to show that he held that position; (3) an email purporting to show that he referenced that position name in his email signature; and (4) his declaration avowing that he was demoted from that position upon his rehiring. (*Id.*) Ruiz also contends that he has offered proof that Witte was "similarly situated" and "treated more favorably" than him because they both simultaneously held "Director of Marketing" positions and performed the same functions, yet Witte was paid a higher salary and given timely bonuses "without ever having to ask." (*Id.* at 10-11.) Ruiz also argues that Magellan's lack of recordkeeping should be "considered by the jury along with Ruiz's other evidence that he held the Director of Marketing position." (*Id.* at 11-12.)

In reply, Magellan argues that the text message on which Ruiz relies is inadmissible hearsay and that the portion of the Witte deposition cited by Ruiz "specifically states that Mr. Ruiz did not hold that title." (Doc. 62 at 4.) Magellan further argues that Ruiz nowhere

"allege[s] that he ever lost that self-appellation, nor does he rebut the evidence set out in the Motion that he maintained the same salary until his termination." (*Id.*)  Additionally, Magellan argues that "[w]ith respect to the element of demonstrating individuals outside the protected class being treated more favorably, Mr. Ruiz also fails." (*Id.*)  To support this contention, Magellan argues that "Mr. Witte was hired by Mr. Ruiz, in a position Mr. Ruiz never held, at a salary almost half that of Mr. Ruiz," and "Mr. Ruiz then resigned his employment shortly after hiring Mr. Witte.  Mr. Witte was then progressively promoted, and eventually worked in overlapping roles with Mr. Ruiz.  He fulfilled job responsibilities Mr. Ruiz did not fulfill.  And Mr. Witte now holds a position (Vice President of Marketing) Mr. Ruiz never held.  While Mr. Witte earned his promotions, Mr. Ruiz maintained his salary, and received regular bonuses, until his termination." (*Id.* at 4-5.)  Magellan also argues that Ruiz fails to offer any evidence showing that Magellan's alleged failure to keep records was only a pretext to shield a discriminatory decision that otherwise could have been documented.  (*Id.* at 5.)

### 2.   Analysis

### i.   **The First Alleged Demotion**

Ruiz's theory regarding his first alleged demotion has been something of a moving target, which has greatly complicated the Court's task at summary judgment.

As background, the complaint does not allege that Ruiz was subjected to two distinct demotions.  Count One (the § 1981-based demotion claim) and Count Four (the Title VII-based demotion claim) each refer to a single "demotion."   (Doc. 1 at 1, 2, 6, 7.)  Additionally, the factual allegations in the complaint simply describe Ruiz's work from when he was "initially hired . . . in April of 2004 . . . until he was demoted in November 2022" and characterize that November 2022 demotion—again in the singular—as "gradual but insidious." (*Id.* at 3-5 ¶¶ 7, 8, 13.)  It is thus understandable why Magellan stated in its summary judgment motion that it believed Ruiz was seeking to challenge only two "claimed adverse employment actions . . . (1) an alleged demotion in November 2022, and (2) the termination of his employment in February 2023." (Doc. 55 at 8.)

Nevertheless, Ruiz argued in his response brief, apparently for the first time, that he was actually subjected to two distinct demotions: one beginning in March 2021, and the other occurring in November 2022.  (Doc. 61 at 1 ["In actuality, Magellan had demoted Ruiz not once but twice after a racially based altercation with [Florence] . . . ."]; *id.* at 10 ["Magellan demoted Plaintiff on [sic] when it rehired him after the altercation with Florence and again in November of 2022."]; *id.* at 14 ["Ruiz alleges that his first demotion began in March of 2021 after the altercation with Florence when unbeknownst to him Ruiz was allegedly assigned to one client, [Mortach]."].)  However, Ruiz did not provide any record citations to support the first and third statements, and the only record citation following the second statement was to paragraph 11 of Ruiz's declaration.  (*Id.* at 10.)  That paragraph provides:

> I complained to Rice, Mann, and C'Debaca on March 15, 2021 in a text message about the altercation with Florence.  Rice disputed my recounting of what happened and accepted my resignation.  About one week later, Byron Rice asked me to come back to work and that I would be made President of my own company but Rice never made me President of my own company.  Instead, Florence literally took my office in Phoenix, even though Florence lives in Kansas and I had to work from home.  Later I figured out that, Magellan had decided to demote me because of my complaints against Florence treating me discriminatorily.

(Doc. 61-1 at 5 ¶ 11.)

In the tentative ruling issued before oral argument, the Court noted the lack of clarity regarding Ruiz's theory of his first demotion.  (Doc. 65 at 14-16.)  Thus, during oral argument, the Court asked Ruiz's counsel to explain how and when this first alleged demotion took place and how it differed from the November 2022 demotion.  Initially, Ruiz's counsel stated that Ruiz's theory regarding the first demotion was "a little difficult to explain" and then acknowledged Ruiz did not even realize, until after he filed this lawsuit, that he had been demoted twice.  Ruiz's counsel then stated that Ruiz's first demotion took the form of only being allowed to work with Mortach after being rehired in April 2021.  However, after the Court pointed out the inconsistency between this theory

and Ruiz's sworn testimony that he was working with several clients in addition to Mortach up to the point of his termination in February 2023,[4] Ruiz's counsel pivoted and stated that the first demotion actually took the form of Ruiz having certain supervisory responsibilities taken away from him (*i.e.*, "slowly being deprived of his team") after being rehired in April 2021.  In response, defense counsel stated, among other things, that "the lack of precision . . . is the point really ultimately of our motion and the reason why summary judgment is appropriate here. . . .  [W]e have a full briefing and we have an oral argument and frankly I still don't have a clear understanding of the precise things that were alleged to be said and done and how they relate to the precise adverse employment actions."

It is well settled that a "[p]laintiff cannot raise a new claim for relief in response to a motion for summary judgment." *Diaz v. Tester*, 2023 WL 3881370, *4 (D. Or. 2023). *See generally Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) ("In response to the motion for summary judgment, Pickern raised issues of ADA violations that went beyond a failure to provide a ramp. . . .  The district court did not err by holding that Pickern failed to provide the Appellees with adequate notice of these new allegations."); *Ward v. Clark Cnty.*, 285 F. App'x 412, 412-13 (9th Cir. 2008) (where the plaintiff asserted a retaliation claim in her complaint but the complaint "neither mentioned nor alluded to" a particular episode, the district court "properly found" that the plaintiff could not premise her retaliation claim on that episode "for the first time in her opposition to Defendant's motion for summary judgment") (citing *Pickern*, 457 F.3d at 968-69).  With the benefit of oral argument, it is now clear that any claim premised on Ruiz's first purported demotion is barred by this rule.  Ruiz's counsel acknowledged during oral argument that Ruiz himself did not come to suspect, until after he filed the complaint, that he had been demoted twice.  However, Ruiz never sought to amend his complaint to add this new claim or otherwise provide notice to Magellan of the existence of this new claim.

---

[4]    *See, e.g.*, Doc. 61-1 at 7 ¶ 20 (Ruiz's declaration: "I also worked with Cortez Wealth Management, Duell Financial Management and Bright Wealth Management handling all of their marketing, creating print material and creating digital ads among other things but Magellan now claims I only worked with [Mortach] at the time it fired me.").

It was thus impermissible for Ruiz to attempt to raise it in response to Magellan's summary judgment motion (which, as noted, understandably focused only on the alleged November 2022 demotion and on the February 2023 termination). Indeed, even as of oral argument, the contours of this new demotion claim appear to be changing. That is not how civil litigation is supposed to work.[5]

### ii.  **The Second Alleged Demotion**

Ruiz's theory regarding the second alleged demotion is that, beginning in November 2022, he became Rice's "personal 'errand boy' . . . [and] was assigned to buy concert tickets and create a personal calendar for [Rice's] amusement." (Doc. 61-1 at 7 ¶ 21.) Although Magellan contends this change does not qualify as an adverse employment action because Ruiz's job title and salary remained the same (Doc. 55 at 8), a "reassignment with significantly different responsibilities" may qualify as a "tangible employment action." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). *See also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) ("We have held that assigning more, *or more burdensome*, work responsibilities, is an adverse employment action.") (emphasis added); *Brown v. Potter*, 457 F. App'x 668, 673 (9th Cir. 2011) (reversing grant of summary judgment because a reasonable factfinder could conclude that "reduc[ing] [the plaintiff's] responsibilities" and "placing [the plaintiff] in ever more obscure and limited positions" qualified as adverse actions); *Novak v. England*, 316 F. App'x 671, 673 (9th Cir. 2009) ("There is also a genuine issue of material fact as to whether Novak suffered an adverse employment action when he was, according to his testimony, reassigned to perform menial work that fell below his job classification and relocated to an isolated overflow area.") (citations omitted); *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) ("A materially adverse change might be indicated by . . . significantly diminished material responsibilities, or other indices that might be unique to a particular

---

[5]    For related reasons, Ruiz's contention during oral argument that "Magellan has waived any and all arguments regarding Count 1 on that [first] demotion because they only raised [the] statute of limitations" is unavailing. It is Ruiz who has effectively waived (or, more precisely, forfeited) any claim based on the first alleged demotion.

situation.").  When all disputed inferences are resolved in Ruiz's favor, a reasonable factfinder could conclude that the reduction in Ruiz's job responsibilities amounted to an adverse employment action.  Additionally, although Magellan contends it had good justification for the change in Ruiz's job responsibilities—namely, Mortach's request to stop working with Ruiz (Doc. 55 at 8)—this argument bears on later steps in the burden-shifting framework, not on the preliminary inquiry of whether there was an adverse action.

Much of the analysis in the tentative ruling concerning Ruiz's second demotion focused on whether Witte qualified as a permissible comparator for purposes of the fourth step of *McDonnell Douglas*.  However, upon further reflection and with the benefit of oral argument, that analysis is unnecessary.  As noted in earlier portions of this order, "a plaintiff can also establish a prima facie case of disparate treatment without satisfying the *McDonnell Douglas* test, if she provides evidence suggesting that the employment decision was based on a discriminatory criterion illegal under the Civil Rights Act." *Cordova*, 124 F.3d at 1148-49 (cleaned up).  For example, in *Cordova*, the plaintiff asserted a Title VII claim for national origin discrimination after she was not selected for a position.  *Id.* at 1146-47.  In an effort to establish a prima facie case outside the *McDonnell Douglas* framework, the plaintiff came forward with evidence that the selection official had made "comments that [one of the plaintiff's co-workers] was a 'dumb Mexican' and that he was hired because he was a minority." *Id.* at 1149.  The Ninth Circuit concluded this "egregious and bigoted insult . . . constitutes strong evidence of discriminatory animus on the basis of national origin" and "direct evidence of . . . discriminatory animus." *Id.*  The court also rejected the notion that the challenged "comments fall within the ambit of stray remarks that have been held insufficient to establish discrimination" because (1) there was "nothing ambivalent about [the] remarks"; (2) the speaker "was the one who" made the challenged employment decision, and thus "if he ha[d] any animus toward Mexicans, it likely would have affected his" decision; and (3) "the timing of [the] remarks is not so far removed from the contested hiring decision so as to render them completely unrelated to that decision." *Id.*

Here, Ruiz has come forward with evidence that Rice, the Magellan employee responsible for his alleged demotion, made comments similar to the "egregious and bigoted" comments in *Cordova*. A summary of this evidence is as follows:

- Sometime around 2005 or 2006, Rice told Ruiz that Ruiz's "parents could not come visit [Ruiz] at [Rice's] house because [Rice] did not want his beds to 'smell like tacos.'" (Doc. 61-1 at 6 ¶ 17.)

- During a fishing trip in 2006, Rice told "Mexican jokes." (Doc. 55 at 32.)

- At unspecified times "[t]hroughout [Ruiz's] tenure, Bryon Rice would call [Ruiz] the brown guy, tell [Ruiz he] smelled like tacos and . . . would say that [Rice] did not know what to do with [Ruiz] because Magellan's customers were mostly white males and would not listen to a Mexican like [Ruiz]. . . . Rice would say racist things to [Ruiz]." (Doc. 61-1 at 5 ¶ 12.)

- At other unspecified times, "Rice repeatedly told [Ruiz] that he did not know what to do with [Ruiz] because Magellan's customers were white males who would not listen to a Mexican like [Ruiz] and [Ruiz] was costing the Company money." (Doc. 61-1 at 7 ¶ 19.)

- At other unspecified times, "Rice took every opportunity to insinuate that he was better than [Ruiz] because he is white and [Ruiz] is Hispanic." (Doc. 61-1 at 10 ¶ 4.)

- Sometime around 2009, Rice stated that Ruiz "would not be able to move up through the company because [Ruiz is] brown, and [Rice] didn't think older white men would listen to a brown person." (Doc. 55 at 25.)

- In or before 2016, Rice told Ruiz "that [Rice] was going to go see his other brown guy in Mexico and not to be jealous." (Doc. 55 at 20.)[6]

- Sometime between 2015 and 2018, Rice told Ruiz: "[W]e work in a business that's predominantly white older men, and I don't think they're going to listen to a Mexican." (Doc. 55 at 27.)

Despite the offensive nature of these alleged comments, the tentative ruling concluded they were ultimately unhelpful to Ruiz because of their remote timing, having

---

[6]    Ruiz stated during his deposition that he sent a particular text message to Rice immediately after the phone call during which Rice allegedly made this comment. (Doc. 55 at 19-20.)  Although that text message does not include a date, a subsequent, unrelated text message is dated April 16, 2016.  (*Id.* at 41.)  The record thus indicates that the call in question occurred sometime in or before 2016.

1    occurred so many years before the challenge employment actions.  However, on reflection,

2    that conclusion was incorrect.  First, although Ruiz did not, during his deposition, identify

3    any specific derogatory comments by Rice after the 2015-18 timeframe, Ruiz stated in his

4    later-prepared declaration that Rice made such comments "[t]hroughout [Ruiz's] tenure."

5    (Doc. 61-1 at 5 ¶ 12.)  Ruiz also stated in his declaration that "Rice's derogatory comments

6    were constant" and that Rice made such comments "repeatedly."  (*Id.* at 7 ¶ 19.)

7          The question for summary judgment purposes is whether these somewhat vague

8    references to the frequency of Rice's comments could lead a reasonable factfinder to

9    conclude that the comments persisted beyond 2015-18—even though Ruiz never identified

10   a specific comment after 2015-18—and occurred closer in time to challenged employment

11   actions (*i.e.*, late 2022 and early 2023).  If the analysis were confined solely to paragraphs

12   12 and 19 of Ruiz's declaration, there is a colorable argument those paragraphs would be

13   too vague to create a triable issue of fact.  After all, those paragraphs provide little if any

14   detail about the substance of Rice's alleged derogatory comments and do not purport to

15   identify when those unspecified comments were made.  *See, e.g., Rushton v. Experi-Metal,*

16   *Inc.*, 2020 WL 7480548, *9 (E.D. Mich. 2020) ("Plaintiff's vague allegations that Ullmann

17   made 'black jokes' and that he overheard people saying 'silverback' behind his back,

18   without specific dates, times, or descriptions, offer little support for the frequency or

19   pervasiveness for his claim of a hostile work environment."); *Ireland v. Rochester Institute*

20   *of Tech.*, 2019 WL 5538371, *6 (W.D.N.Y. 2019) ("Ireland's Complaint contains other

21   conclusory allegations that Slusser harassed her 'throughout the course of her employment'

22   and 'on several occasions' made 'sexually suggestive comments' without specifying when

23   or how often such instances occurred or the nature of what was said.  Vague allegations

24   like these are insufficient to state a claim . . . ."); *Petrie v. City of Grapevine*, 904 F. Supp.

25   2d 569, 587 (N.D. Tex. 2012) (granting summary judgment to defendant, where the

26   plaintiff sought to establish liability by relying on an affidavit claiming that certain

27   retaliatory acts "continued throughout my tenure with the Police Department," because the

28   "vague and conclusory affidavit" failed to "state when the retaliatory allegedly acts

occurred"); *Childs v. Illinois Dept. of Mental Health*, 1997 WL 534246, *2 (N.D. Ill. 1997) (dismissing Title VII retaliation claim, despite plaintiff's allegation that "[t]hroughout my employment I have complained of employment discrimination," because this allegation was "vague and conclusory" and because "[i]f Childs wishes to state a claim for retaliation, he must specify . . . approximately when he made his complaints"); *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 439-40 (7th Cir. 1996) (granting summary judgment to defendant, where plaintiff had the burden of showing that a certain number of employees were physically present at the worksite on certain days but only asserted in a declaration that "twenty-four employees worked 'throughout my employment," because "this level of generality does not suffice").

Nevertheless, the references to "constant" and "repeated" comments by Rice in paragraphs 12 and 19 of Ruiz's declaration must be considered in conjunction with Ruiz's deposition testimony, which identified a number of specific derogatory comments by Rice and provided approximate dates for those comments (albeit dates ranging from 2005-18). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (courts at summary judgment must view the record "as a whole"). When those two sources of evidence are considered together, a reasonable factfinder could conclude that Rice continued making derogatory comments regarding Ruiz's Mexican origin in 2021, 2022, and 2023 that were similar to the specific derogatory comments Ruiz attributes to Rice during the 2005-18 timeframe. *See, e.g.*, *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1035 (9th Cir. 2005) ("The district court . . . noted that Dominguez did not cite the dates on which Stacey made discriminatory remarks, and that she failed to describe his jokes 'with any specificity.' However, Dominguez's failure to offer precise dates does not defeat her claim, especially in light of her testimony that the jokes were 'like everyday' occurrences. Moreover, Dominguez was not required to recite Stacey's remarks verbatim; she provided sufficient details of the jokes' content to enable a reasonable trier of fact to conclude that discrimination had occurred.") (citation omitted); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 92 (1st Cir. 2019) ("[T]he district court appears to have

believed that Rivera was required to produce evidence of every single individual offensive act directed toward her—including the exact date, exact individual involved, and exact words used. . . .   In fact, imposing such a requirement would likely create an insurmountable threshold for litigants alleging repeated harassment similar to the type Rivera claims here.  It would be unreasonable to expect the average worker in an allegedly perpetually abusive environment to keep track of her abuse to that degree of detail (lest we mandate the keeping of a diary in anticipation of litigation, which we decline to do).  In instances of alleged habitual persecution like Rivera's, one day's harassment can easily bleed into the next.  Thus, where a worker being continuously harassed is able to provide information about the type of harassment (including specific words, actions, or incidents) directed at her, as well as the individuals involved in creating such an environment, such claims should generally be sustainable provided the employee can tie her mistreatment to her membership in a protected class.").  Of course, a reasonable factfinder might also conclude, based on Ruiz's rather conspicuous lack of detail in his declaration, that the comments stopped years before the challenged employment actions at issue here, but the Court must resolve this disputed inference in Ruiz's favor at this stage of the case. *Dominguez-Curry*, 424 F.3d at 1039 ("The district court improperly discounted this testimony on the ground that Dominguez 'could give no specifics' regarding when Stacey made these comments.  As noted, a plaintiff need not recite precise dates of an employer's discriminatory conduct, especially where she alleges that the conduct was pervasive.  While a factfinder is free to conclude at trial that the plaintiff's account is insufficiently detailed to be believable, the district court must refrain from making such credibility assessments on summary judgment.").

Additionally, although Ruiz has not identified any specific comment by Rice after 2015-18 that overtly denigrated Ruiz's Mexican origin, Ruiz contends in his declaration that "[i]n December of 2020, Rice was driving me to the airport from his house and . . . insulted me when I told him that I have a special needs daughter.  Rice laughed and said, 'Of course you would have [a] retarded daughter' like I would breed a person

with special needs because I am [of] Mexican heritage." (Doc. 61-1 at 6 ¶ 13.) Even though this alleged comment by Rice did not, on its face, have anything to do with Ruiz's Mexican origin—a point emphasized in the tentative ruling—the facially neutral status of the comment does not, on reflection, necessarily render it irrelevant. As the Second Circuit has explained in the hostile work environment context: "Facially neutral incidents may be included . . . so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002). For example, a "fact-finder could reasonably infer that facially sex-neutral incidents were sex-based where the perpetrator had previously made sexually derogatory statements." *Id.* (citation omitted). *See also E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400-01 (5th Cir. 2007) ("Argabrite frequently banged on the glass partition of Rafiq's office, in order to startle him. . . . [I]n the context of Argabrite's other actions toward Rafiq, a factfinder could reasonably conclude that this conduct was also motivated by animus stemming from Rafiq's religion and national origin."). Here, in light of the evidence of Rice's "constant" comments targeting Ruiz's Mexican origin from 2005-18 and beyond, a reasonable factfinder could conclude that Rice's 2020 comment concerning Ruiz's daughter was also motivated by discriminatory animus despite being facially neutral.[7]

Finally, although *Cordova* suggests that the temporal remoteness of a derogatory

---

[7]     In contrast, although Ruiz asserts in his declaration that his dispute with Florence in March 2021 was "because of [his] race national origin" and resulted in "racial humiliation" (Doc. 61-1 at 5 ¶¶ 8-10), the only facts provided in Ruiz's declaration concerning this incident are that the dispute involved technical issues over the use of robotic cameras and that Florence felt disrespected by Ruiz's insistence on raising the issue. (*Id.*) Additionally, Ruiz does not contend that Florence (as opposed to Rice) ever made derogatory comments concerning individuals of Mexican origin. Thus, no reasonable factfinder could conclude that the facially neutral altercation between Rice and Florence was secretly motivated by Florence's animus toward individuals of Mexican origin. As Magellan correctly states in his reply: "[Paragraphs [8-10] do not detail a 'racial altercation,' but an altercation allegedly regarding using 'robotic cameras' as part of a film studio project. Mr. Ruiz simply inserts the words 'race national origin' (it is unclear which he believes was a motivating factor), but describes no facts that could lead a reasonable juror to conclude that these prohibited motivations were in fact a motivating factor in the incident." (Doc. 62 at 2.)

comment may, at a certain point, be a reason to conclude it no longer qualifies as direct evidence of discrimination—which is another concept the tentative ruling emphasized—the parties have not cited (and the Court has not found) any definitive Ninth Circuit authority identifying just how remote in time such a comment must be before it ceases to function as direct evidence.  Additionally, the Ninth Circuit has stated in other decisions "that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer."  *Dominguez-Curry*, 424 F.3d at 1039.  *See also Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998) ("Evidence of ethnically biased remarks from a person in such a position of authority are sufficient to allege the connection necessary . . . to survive summary judgment.").  Here, Ruiz's evidence can be reasonably construed as establishing that Rice, the Magellan employee responsible for the alleged demotion, made "constant" discriminatory comments regarding individuals of Mexican origin over the span of nearly 20 years, including close in time to the alleged demotion.  Plaintiff has thus done enough to establish a prima facie case at summary judgment.  *See also Nguyen v. Qualcomm, Inc.*, 501 F. App'x 691, 694 (9th Cir. 2012) ("Stanton was Nguyen's direct supervisor.  Stanton's comments to Nguyen create a genuine issue of material fact on whether Nguyen's gender and Vietnamese national origin were 'motivating factor[s]' in her termination.  This genuine issue of material fact defeats summary judgment; the *McDonnell Douglass* framework is inapplicable here because Nguyen presented direct evidence of discrimination.") (citations omitted).

The determination that Ruiz has come forward with legally sufficient direct evidence of discriminatory animus also requires reconsideration of the other bases identified in the tentative ruling for granting summary judgment to Magellan on Ruiz's demotion claim.  For example, although Magellan contends it had a legitimate, nondiscriminatory reason for the challenged action—specifically, that Mortach "asked to no longer work with [Ruiz], because [Mortach] was not satisfied with [Ruiz's] client services"—and that Ruiz lacks evidence this reason was pretextual (Doc. 55 at 8; Doc. 62

at 5-6), the requirement that Ruiz's pretext evidence "be both specific and substantial . . . only applies to circumstantial, not direct, evidence of discriminatory motive.  Here, [Ruiz does] not rely on circumstantial evidence; rather, [he offers] direct evidence of animus, which creates a triable issue . . . even if the evidence is not substantial. . . .  Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  *Dominguez-Curry*, 424 F.3d at 1038 (cleaned up).  *See also Lessor v. J. C. Penney Corp Inc.*, 459 F. App'x 623, 624 (9th Cir. 2011) (reversing grant of summary judgment on Title VII claim for wrongful termination, even though the employer "gave a legitimate, nondiscriminatory reason . . . that was sufficient to rebut a prima facie case of discrimination" by claiming the plaintiff "was terminated for refusing to accept a 'performance plan' created for her after several customer complaints," because the plaintiff testified that one of the individuals "involved in the decisionmaking process that led to [her] termination . . . made discriminatory remarks" during a particular conversation and, under *Dominguez-Curry*, "a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment") (cleaned up).

Finally, the so-called "same-actor inference" also does not compel summary judgment in Magellan's favor.  Under that doctrine, "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory action." *Coghlan*, 413 F.3d at 1096.  A plaintiff must "muster [an] extraordinarily strong showing of discrimination" to defeat the same-actor inference at summary judgment.  *Id.* at 1097.  And although usually framed in terms of "hiring and firing," the same-actor inference also applies to other adverse employment actions, such as demotion.  *Id.* at 1096-97 ("[A]lthough we phrased the same-actor rule in *Bradley* in terms of 'hiring and firing,' its logic applies no less to cases such as this one, in which the plaintiff was not actually fired but merely offered a less desirable job assignment.").

At first blush, the same-actor inference would seem to preclude liability because Rice, the Magellan official responsible for the alleged demotion in November 2022, was

personally responsible for re-hiring Ruiz in April 2021 and also provided multiple discretionary bonuses of $10,000—which were "higher than the rest" of the bonuses offered to other employees—to Rice between April 2021 and November 2022. (Doc. 61-1 at 22-23.)[8]  In the tentative ruling, the Court concluded that this evidence of favorable treatment toward Ruiz by Rice during the year-and-a-half period preceding the alleged November 2022 demotion, coupled with the absence of any evidence of racially derogatory comments by Rice during that period, raised a strong inference that Rice's proffered reason for demoting Ruiz was not a pretext for discrimination.  *Coghlan*, 413 F.3d at 1097 (rejecting plaintiff's argument "that the same-actor inference is not relevant here because three years elapsed between" the favorable conduct and the challenged conduct); *Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012) ("The inference . . . may arise when the favorable action and termination are as much as a few years apart.").  However, the Court has now determined that a reasonable factfinder could conclude—despite the vague nature of Ruiz's declaration—that the derogatory comments by Rice continued after April 2021.  In light of that determination, as well as the Ninth Circuit's rule that derogatory, ethnically biased remarks by a decisionmaker function as particularly powerful direct evidence of discrimination, Ruiz has done enough to avoid the same-actor inference, at least for summary judgment purposes.  *Compare Beecham v. Wyndham Vacation Resorts, Inc.*, 2013 WL 6730755, *8 (D. Haw. 2013) ("[T]hese comments allegedly made by Barker [in 2007 and 2008] do not refute the same actor inference because Barker contacted Plaintiff in May of 2009 to assess Plaintiff's interest in working as a manager.  Barker's alleged invidious age discrimination did not prevent him from expressing interest in hiring Plaintiff for a management role.").

Accordingly, Magellan is not entitled to summary judgment on the portions of Counts One and Four premised on the alleged November 2022 demotion.

---

[8]    Although the relevant transcript excerpt does not specifically say that Rice awarded the bonuses, Rice was Magellan's CEO and Ruiz's supervisor and appears to have been involved in all such decisions.  (Doc. 61-1 at 22-23.)  Moreover, the undisputed evidence indicates that, at Magellan, supervisors made bonus decisions.  (*Id.* at 22 ["Q: What was the reason for [that bonus]?  A: You would have to ask his supervisor."].)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

B.     **Wrongful Termination Claims**

As noted, Ruiz asserts two wrongful termination claims—one under Title VII and one under § 1981.  Both are premised on Ruiz's termination in February 2023.

1.     The Parties' Arguments

Magellan admits that it terminated Ruiz and that this termination was an adverse employment action.  (Doc. 55 at 8.)  Magellan argues, however, that Ruiz is unable to establish a prima facie case for discrimination because he "has not identified similarly situated individuals outside his protected class that were treated more favorably, or other facts that would support an inference of discrimination."  (*Id.* at 8-9.)  Magellan also proffers a non-discriminatory reason for Ruiz's termination—namely, that "Magellan had no work for him"—and argues that Ruiz has not offered sufficient evidence to establish pretext.  (*Id.* at 9.)

In response, Ruiz argues, as with his demotion claims, that he has shown sufficient evidence of discriminatory animus to make a prima facie case.  (Doc. 61 at 10-11.)  Ruiz also argues that Magellan's proffered reason for termination is pretextual because his "job entailed more than working for [Mortach]" and because "Magellan posted [his] job after firing [him] and Witte is performing the Director of Marketing work to this day."  (*Id.* at 12-13.)

In reply, Magellan reiterates that Ruiz has failed to establish a prima facie claim of discrimination.  (Doc. 62 at 4.)  Magellan also argues that Ruiz "fails to create a triable issue on his contention that Magellan lacking work for him to perform was 'pretext.'"  (*Id.* at 5.)  According to Magellan, this is because Ruiz's claims are "based solely again on his self-serving declaration, which provides no significant timelines or dates for the other work he claims he was performing" and because Ruiz does not explain the relevance of the cause of Mortach's dissatisfaction.  (*Id.*)

2.     Analysis

Although the tentative ruling concluded that Magellan was entitled to summary judgment on Ruiz's wrongful termination claims, reconsideration of that conclusion is

- 26 -

1    warranted in light of the determination, discussed in further detail above, that Ruiz has
2    come forward with legally sufficient direct evidence of discriminatory animus attributable
3    to the relevant decisionmaker.  Given that determination, Ruiz need not establish that Witte
4    qualifies as a similarly situated comparator under the *McDonnell Douglas* framework—
5    instead, the direct evidence of discriminatory animus alone suffices to establish a prima
6    facie case.  *Cordova*, 124 F.3d at 1148-49; *Wallis*, 26 F.3d at 889; *Nguyen*, 501 F. App'x
7    at 694.  That same direct evidence of discriminatory animus also suffices to create a triable
8    issue of fact about whether Magellan's proffered reason for the termination decision was
9    pretextual.  *Dominguez-Curry*, 424 F.3d at 1038-39; *Lessor*, 459 F. App'x at 624.  Finally,
10   because a reasonable factfinder could conclude that Rice's comments persisted beyond
11   Ruiz's rehiring in April 2021 and receipt of discretionary bonuses throughout 2021 and
12   2022 and continued up to the point of Ruiz's termination in February 2023, the same-actor
13   inference does not compel summary judgment in Magellan's favor.[9]

14   Accordingly, Magellan is not entitled to summary judgment as to Ruiz's wrongful
15   termination claims under Title VII (Count Five) and § 1981 (Count Two).

16   C.    **Hostile Work Environment Claim**

17   Ruiz's final claim is a race-based hostile work environment claim under § 1981.
18   The parties agree the statute of limitations for this claim is four years.  (Doc. 55 at 7; Doc.
19   61 at 13-14.)

20   1.    The Parties' Arguments

21   Magellan argues it is entitled to summary judgment on the hostile work environment
22   claim because "[m]any of Plaintiff's sundry allegations are outside [the] applicable statute
23   of limitations."  (Doc. 55 at 7.)  Magellan's argument appears to be that without those time-
24   barred allegations, Ruiz cannot satisfy the elements of his hostile work environment claim.

25   In response, Ruiz argues that he has "provided evidence that Rice regularly said
26   racially offensive things to him" and that those acts, although outside the statute of
27   limitations, may be properly considered as part of the hostile work environment claim

28   _____
[9]    These conclusions make it unnecessary to resolve the parties' disputes over the job listing on Indeed.com.

1    under *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), because he has

2    proffered evidence of other conduct that occurred "within the four-year time period." (Doc.

3    61 at 16-17.)

4    In reply, Magellan argues that Ruiz's reliance on *Morgan* is misplaced because

5    Ruiz's resignation constitutes an "intervening act" that precludes him from arguing that

6    "alleged actions by Magellan before March 2021 are part of the same unlawful practice as

7    alleged actions after Mr. Ruiz was re-hired in or around April 2021." (Doc. 62 at 6.)

8    Magellan further argues that "the remaining allegations, especially in light of the paucity

9    of objective evidence, are 'neither severe nor pervasive enough to alter the conditions of

10   Mr. Ruiz's employment' such that he suffered a hostile work environment." (*Id.*, cleaned

11   up).

12                          2.    Analysis

13   A hostile work environment claim is composed of a series of separate acts that

14   collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e–5(e)(1).

15   "To establish the prima facie hostile work environment claim under . . . § 1981," a plaintiff

16   "must raise a triable issue of fact as to whether (1) [he] was subjected to verbal or physical

17   conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was

18   sufficiently severe or pervasive to alter the conditions of [his] employment and create an

19   abusive work environment." *Manatt*, 339 F.3d at 798 (cleaned up). "[T]o determine

20   whether an environment is sufficiently hostile or abusive," courts "look[] at all the

21   circumstances, including the frequency of the discriminatory conduct; its severity; whether

22   it is physically threatening or humiliating, or a mere offensive utterance; and whether it

23   unreasonably interferes with an employee's work performance." *Faragher v. City of Boca

24   Raton*, 524 U.S. 775, 787-88 (1998) (cleaned up). "[S]imple teasing, offhand comments,

25   and isolated incidents (unless extremely serious) will not amount to discriminatory changes

26   in the terms and conditions of employment." *Id.* (cleaned up).

27   As noted, Plaintiff's claim is subject to a four-year limitations period. "It does not

28   matter . . . that some of the component acts of the hostile work environment fall outside the

statutory time period.  Provided an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.  *Morgan*, 536 U.S. at 117.  *See also Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) ("*Morgan* does not call for the most egregious of the harassing events to occur within the [statutory] period, nor does it demand that the harassing conduct continue to escalate over time in order for a hostile-environment claim to be actionable."); *Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003) ("In contrast to discrete acts . . . claims based on a hostile environment will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.") (cleaned up).

In determining whether conduct is "part of the same unlawful employment practice," courts analyze whether the earlier conduct is related to the later conduct that falls within the statutory period.  *Morgan*, 536 U.S. 101, 118 ("On the other hand, if an [earlier act] had no relation to the acts [within the statutory period], or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts.").  Here, Ruiz's hostile work environment claim is largely premised on the racially derogatory comments that Rice made "repeatedly" and "throughout" Ruiz's tenure.  Although the tentative ruling concluded that Ruiz could not rely on those comments for purposes of his hostile work environment claim because they all occurred before the four-year statutory period, that conclusion must be reconsidered in light of the analysis set forth in earlier portions of this order establishing that a reasonable factfinder could conclude Rice's comments continued throughout 2021, 2022, and 2023.  For similar reasons, a reasonable factfinder could also conclude that Rice's alleged insult of Ruiz's daughter—which occurred during the four-year period—was motivated by discriminatory animus despite its facially neutral status. *Alfano*, 294 F.3d at 378; *WC&M Enters., Inc.*, 496 F.3d at 400-01.

For these reasons, Magellan is not entitled to summary judgment on Ruiz's hostile work environment claim under § 1981 (Count Three).

Accordingly,

**IT IS ORDERED** that Magellan's motion for summary judgment (Doc. 55) is **granted in part and denied in part**.  More specifically, the motion is granted as to any portion of Counts One and Four premised on the first alleged demotion.  Otherwise, the motion is denied.

Dated this 30th day of June, 2025.

_____
Dominic W. Lanza
United States District Judge