**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael L Ruiz, | No. CV-23-02090-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Magellan Financial & Insurance Services, | |
| Defendant. | |

In this action under Title VII and 42 U.S.C. § 1981, Plaintiff Michael Ruiz ("Ruiz") is suing his former employer, Defendant Magellan Financial & Insurance Services ("Magellan"), under the theory that his alleged demotion and subsequent termination were due to his race and national origin and that he was also subjected to a hostile work environment. Recently, the Court denied, in significant part, Magellan's motion for summary judgment as to those claims. (Doc. 67.)

Ruiz retained an expert, Michael Stokes ("Stokes") of Beta Business Consulting LLC ("Beta"), to calculate the net present value of his lost wages and benefits. Stokes's opinions are set forth in a written report ("the Report"). (Doc. 56 at 52-62.) Now pending before the Court is Magellan's motion to exclude Stokes's opinions. (Doc. 56.) For the reasons that follow, that motion is denied.[1]

…

…

---

[1] Magellan's request for oral argument (Doc. 56 at 1) is denied because the issues are fully briefed and oral argument would not aid the Court's decision. *See* LRCiv 7.2(f).

# DISCUSSION

I. <u>Legal Standard</u>

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

(*Id.*)

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 'contemplates a broad conception of expert qualifications.'" *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (citation and emphasis omitted). Years of relevant experience can establish the necessary "minimal foundation." *Id.* at 1015-16 (finding that twenty-five years of working as an independent consultant and an expert witness in the insurance industry satisfied the "minimal foundation" necessary to provide expert testimony). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

Beyond this threshold requirement, a district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry

envisioned by Rule 702 is . . . a flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it "'has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.* "Applying a higher standard than helpfulness to otherwise reliable expert testimony is unnecessarily strict." Fed. R. Evid. 702, advisory committee note to 2023 amendments.

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (citation and internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to

testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169. *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.").

The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee note to 2000 amendments. However, "nothing . . . requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The . . . standard does not require perfection." Fed. R. Evid. 702, advisory committee note to 2023 amendments.

II.     Stokes's Qualifications

    A.     **The Parties' Arguments**

Magellan argues that Stokes is unqualified because "his financial or accounting

training concerned issues related to capital and corporate investment, and no other topics" and "[h]e has no other certifications or licenses, and no publication history." (Doc. 56 at 5.) Magellan further argues that beyond his lack of credentials, Stokes lacks qualifying experience because "[h]is firm was formed by his father," "Beta's sole occupation is to provide economic analyses in the context of litigation, including four to five cases on behalf of [Ruiz's] counsel," and that when generating his reports, Stokes "uses a form template, plugs in biographical and income information from the subject, and the template report is populated with the resulting calculations, using the same assumptions and averages in every report and for every different case." (*Id.*) Moreover, Magellan argues that "Mr. Stokes did not demonstrate any particular aptitude, knowledge or skill that would qualify him to explain concepts such as the present value of future earning potential to a jury. Mr. Stokes was not aware of basic concepts relevant to his report, such as the method of calculating the 'fringe benefit' of social security, the cap applicable to social security taxes, etc." (*Id.*)

In response, Ruiz argues that "an expert need not have an official credential in the relevant subject matter to meet the requirements of Rule 702" but rather can be "self-trained." (Doc. 59 at 2.) In support, Ruiz cites *United States v. Smith*, 520 F.3d 1097 (9th Cir. 2008), and *Hambrook v. Smith*, 2016 WL 4084110 (D. Hawaii 2016). (*Id.*) Ruiz contends that Stokes is thus "qualified by his knowledge, skill, experience, and training to testify to the matters in his report" because he "holds a BA in English, an MBA and has been employed as a ligation related economic expert for 6 years at Beta Consulting, directly trained by his father, Dr. Larry Stokes who holds a Ph.D. in economics." (*Id.*)

In reply, Magellan argues that Ruiz "offers no admissible evidence to support [Stokes's] supposed training, and no details as to how this supposed training qualifies Mr. Stokes as an expert." (Doc. 60 at 4.) "Instead, he admits that Mr. Stokes's only occupation is in the undefined 'litigation report field,' and only for a few years. And [Ruiz] provides only representations of counsel regarding supposed training from Mr. Stokes's father." (*Id.*) Magellan also argues that Ruiz's cited cases provide no support, because *Smith* was

- 5 -

deemed nonprecedential after the Ninth Circuit granted a request to hear the matter *en banc* and *Hambrook* actually supports Magellan's position. (*Id.*)

### B. Analysis

The Ninth Circuit has emphasized that Rule 702 "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994). The proponent of expert testimony need only lay a "minimal foundation" of "knowledge, skill, experience, training, or education" in the topic at hand. *Id.* Although an expert may not offer opinions on matters "outside the areas of [the expert's] expertise," *Avila v. Willits Envtl. Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011), an expert's "lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). However, "lack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area." *Avila*, 633 F.3d at 839.

Applying these principles, Stokes is qualified to offer opinions about the net present value of Ruiz's purportedly lost wages and benefits. First, Stokes's opinions are "within the reasonable confines of his subject area." Stokes holds an MBA from the University of Massachusetts, where he took classes on management, supply-chain management, entrepreneurship, finance, and basic economics. (Doc. 56 at 22, 26.) As for the "finance and accounting" portion of his studies, Stokes studied "[a]nything from investment to just looking at capital investment, corporate investment." (*Id.* at 26.) These areas of study appear to encompass the opinions set forth in the Report.[2] Although Magellan may be correct that Stokes's credentials are not highly specialized, the absence of specialization

---

[2] Magellan appears to suggest that Stokes is unqualified in part because he attended an "online" MBA program. Putting aside that the materials cited by Magellan do not reflect whether the MBA program was an "online" program, courts have rejected similar arguments. *Lifeguard Licensing Corp. v. Kozak*, 2017 WL 908199, *7 (S.D.N.Y. 2017) ("The defendants' complaints about Mr. Sowers' education and experience are overblown, undersupported, or both. For example, they attack his education, noting that his MBA is from a satellite campus of the University of Colorado, and was completed as an online degree. But they provide no evidence to support their contention that his education and degree are inferior.").

- 6 -

goes to the weight of Stokes's testimony and does not provide a basis for exclusion. *Avila*, 633 F.3d at 839. *See also Longoria v. Kodiak Concepts LLC*, 2021 WL 1100373, *10-11 (D. Ariz. 2021) (allowing expert with a Ph.D. in economics to opine on issue of "how to calculate the fair market value of a strip club's unauthorized use of a model's photograph," which was somewhat outside of his specialized area of expertise); *Cawley v. Am. Fin. Sec. Life Ins. Co.*, 2025 WL 1826698, *15 (D. Ariz. 2025) ("The Court finds that Mr. McKinnon is certainly adequately qualified as an economist: he has a Bachelor of Science in Mathematics, a Master of Business Administration, and a Master of Science in Mathematics.").

Second, Stokes's experience also forms part of the basis for his qualification to testify as an expert. Stokes is an "economic analyst" for Beta, where he has worked since 2018, and is now the full owner of the company. (Doc. 56 at 22, 29-30.) Before assuming ownership, Stokes was trained by the founder and previous owner, Larry Stokes (his father), who has a Ph.D. in economics. (*Id.* at 29, 31, 50.)[3] Stokes still "tend[s] to keep those methods that [he has] been trained upon." (*Id.* at 31.) In addition to being trained and advised by his father, Stokes "occasionally reviews" trainings from the National Association of Forensic Economics ("NAFE"),[4] a standards-setting association for forensic economists of which he is a member. (*Id.* at 22, 31.) Courts have cited membership in this organization as a factor supporting expert qualification for economic damages analysis.

---

[3] Magellan suggests that Stokes's training under Larry is unsupported by anything other than Ruiz's counsel's *ipse dixit*. (Doc. 60 at 4.) This argument is unavailing—Stokes testified during his deposition that he received "direct training . . . under Dr. Larry Stokes." (Doc. 56 at 31.) Nor does it require any great leap of logic to assume that Larry trained his son (and only employee) in the financial and accounting matters relevant to his duties at Beta in "litigation related economic analysis, business planning and valuation."

[4] NAFE's website describes itself in the following terms: "The National Association of Forensic Economics is an association of more than 500 professionals. NAFE members believes [sic] our association is a community where information can be exchanged and ideas can be advanced that advance the field of forensic economics. In our association, the scientific discipline of forensic economics is advanced through: member participation in international, national and regional meetings, the publication of our peer-reviewed academic journal, the Journal of Forensic Economics, our shared commitment to ethical principles and principles of professional practice." National Association of Forensic Economics, About, https://nafe.net/about-us/.

*Cawley*, 2025 WL 1826698 at *15 (concluding that "Mr. McKinnon is certainly adequately qualified as an economist," in part because he "is a member of . . . the National Association of Forensic Economics"); *N. Regal Homes, Inc. v. Roundpoint Mortg. Servicing Corp.*, 2016 WL 7441634, *10 (D. Utah 2016) (finding an expert was "qualified by knowledge, skill, experience, training, and/or education" in part because he was "a member of the National Association of Forensic Economics") (cleaned up); *Holscher v. Olson*, 2008 WL 2645484, *5 (E.D. Wash. 2008) (finding an expert "has the education, experience, and knowledge to qualify as an expert under Rule 702" in part because he was "a member of . . . the National Association of Forensic Economics").

Taken together, Stokes's training and experience supply the "minimal foundation" necessary for admission. *Hangarter*, 373 F.3d at 1015-16. *See also Hambrook*, 2016 WL 4084110 at *5-6 ("[T]hat Dr. Male does not have a degree in accounting or economics, was to a certain extent self-taught, and the fact that the professional organizations he belongs to do not require specific qualifications, do not make him unqualified as an expert" to testify as to future economic losses).[5] Magellan's criticisms of the strength of Stokes's credentials thus "go to the weight, not the admissibility, of his testimony." *Kennedy*, 161 F.3d at 1231.

None of Magellan's remaining counterarguments affect this conclusion. That Stokes uses a "template" as part of his method (Doc. 56 at 5) at most goes to whether his *methodology* is sound and has no bearing on the distinct issue of whether he has the training and experience necessary to be *qualified* as an expert. Likewise, Magellan's assertion that Stokes did not demonstrate "any particular aptitude, knowledge or skill" during his deposition (*id.*) fails to establish that he is unqualified. Nor does *Mikulan v. Allegheny*

---

[5] Magellan contends that *Hambrook* "explicates why the Court should grant the Motion" (Doc. 60 at 4) because, although it "does make the point that an expert can be theoretically qualified through self-study," the expert in *Hambrook* had vastly superior credentials to Stokes. Although the distinction is well taken, the question before the Court is whether Stokes's education and training are sufficient to establish the "minimal foundation" necessary to support admissibility. They are, for the reasons stated above, and *Hambrook* merely adds additional support because its stands for the proposition that an expert retained to calculate economic damages does not need formal, specialized degrees in economics or accounting.

*Cnty.*, 2017 WL 2374430 (W.D. Pa. 2017),[6] support Magellan's position. There, the plaintiff, a prison corrections officer, sought to offer "non-expert lay opinion testimony regarding [his future economic] damages that requires accounting principles and methodology." *Id.* at *8. The district court declined to allow the plaintiff to present this testimony because he "lack[ed] the necessary training" and had "not even attempted to show that he has the required technical or specialized knowledge to be able to testify as to the method of computing this complex calculation." *Id.* at *8-9. Here, in contrast, Ruiz is not attempting to provide lay testimony that purports to calculate the net present value of his future lost wages and benefits—instead, he has retained Stokes to do so, and Stokes possesses the required minimal qualifications to opine on this topic for all of the reasons stated above.

III.  Relevance

    A.  **The Parties' Arguments**

Magellan next argues that Stokes's testimony is not relevant because it does not consider the relevant factors in an economic damages calculation "such as back pay or mitigation" and only "seeks to estimate what [Ruiz] might have earned from Magellan had he not been terminated." (Doc. 56 at 5-6.) Magellan contends these omissions render Stokes's opinions irrelevant because Ruiz "claims that Mr. Stokes's calculation represents his damages" and "Mr. Stokes's testimony will therefore only cause confusion and prejudice, by potentially misleading the jury into thinking Mr. Stokes has calculated [Ruiz's] damages" when in fact he has not. (*Id.* at 6-7.)

In response, Ruiz argues that Stokes's failure to address mitigation goes to the weight of the testimony and is to be addressed by the jury, for which proposition he offers *Holscher*. (Doc. 59 at 2-3.) Ruiz admits that the Report does not "represent his damages" but contends that Stokes's opinions remain "relevant and will be helpful to the jury to determine [his] damages." (*Id.* at 3.)

---

[6] Magellan cites this case in the section of its brief analyzing the reliability of Stokes's opinions (Doc. 56 at 8) but includes a parenthetical that appears to question Stokes's qualifications.

- 9 -

In reply, Magellan argues that Ruiz misrepresents and misapplies *Holscher* and that Stokes's expert opinion "would serve no purpose in this matter" because it "did not consider that [Ruiz] immediately obtained *more* lucrative employment" after his termination. (Doc. 60 at 3.)

B.   **Analysis**

The Report purports to calculate the net present value, $3,729,078, of the wages and benefits Ruiz would have earned had he remained employed by Magellan until his retirement. (Doc. 56 at 36, 59.) Although this figure likely overstates Ruiz's economic damages, because it makes no attempt to account for offsets and mitigation, it is still at least one piece of the puzzle. Thus, it is relevant. *Daubert*, 509 U.S. at 587 ("[Rule 401's] basic standard of relevance thus is a liberal one.").

Magellan also invokes Rule 403 of the Federal Rules of Evidence, which provides that courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Magellan contends that even if relevant, Stokes's testimony would be confusing, misleading, and/or prejudicial because Ruiz "claims that Mr. Stokes's calculation represents his damages." (Doc. 56 at 6-7.) In essence, Magellan argues that a jury would be confused by the difference between Stokes's economic earnings projection and "economic damages," which are calculated by incorporating a variety of figures, including mitigation. The problem with this argument is that although Ruiz has at times during this case appeared to characterize the Report as showing his economic "damages" (*id.* at 19), the Report itself does not purport to calculate Ruiz's litigation damages and Stokes did not suggest as much in his deposition. In fact, he clearly stated the opposite. (*Id.* at 37 ["Q: Do you know how damages are calculated in employment cases? A: I do. There's various ways to do it. In this report, though, we just had—we just did the one set of earnings' calculations, so we didn't do a pre and a post, and then we didn't subtract that from each other."].) Moreover, Ruiz clarifies in his response brief that the Report does not

purport to establish his damages and will simply "be helpful to the jury *to determine* [Ruiz's] damages." (Doc. 59 at 3.) Given this backdrop, the Court will not categorically exclude Stokes's opinions before trial based on Rule 403.

IV.   Reliability

    A.    **The Parties' Arguments**

Magellan's final argument for exclusion is that "Mr. Stokes's opinion is not reliable because it did not comply with his own assumptions." (Doc. 56 at 7.) Specifically, Magellan contends that Stokes "assumed that generally an employee's earnings peak mid-career, and then 'tend to' decline toward the end of the employee's working life. The opinion Mr. Stokes offered, however, assumed that [Ruiz's] earnings would continue to increase through the end of his working life." (*Id.*) Magellan also argues that Stokes's response during his deposition that "sometimes we see that [wages] do diminish somewhat, and sometimes we don't" is indicative of unreliability. (*Id.*) Magellan further argues that Stokes used "other unreliable assumptions"—namely, he used "industry averages" to quantify Ruiz's health and retirement benefits instead of Ruiz's actual health and retirement benefits (which were included in Ruiz's W-2s); he used "a simple equation multiplying projected earnings by 6.2% to represent the 'fringe benefit' of employee social security taxes," which is out of step with the approaches adopted by courts; he "failed to consider the current 'cap' on social security taxes in making his calculation"; and he "included 1.45% of earnings for Medicare taxes as a 'fringe benefit'" even though Medicare "is available regardless of an individual or his employer's payment of Medicare taxes." (*Id.* at 7-9.)

In response, Ruiz argues that Stokes's method is reliable, that Magellan provides no authority suggesting otherwise, and that Magellan's criticisms of Stokes's report are "points to be made on cross-examination." (Doc. 59 at 3-4.)

In reply, Magellan reiterates its methodological criticisms and argues that Ruiz fails to meaningfully respond to many of them, including the use of industry averages for benefits, Stokes's failure to follow his own assumptions, and the flaws in Stokes's Social

- 11 -

1  Security benefits calculations or his inclusion of Medicare as a fringe benefit. (Doc. 60 at
2  2.) Magellan also argues that Ruiz fails to address Stokes's admission "that he essentially
3  plugs numbers into a pre-crafted template report, with little to no change in the format and
4  assumptions used across all reports and all cases." (*Id.*)

        B.    **Analysis**

Magellan's reliability-based arguments do not provide a basis for exclusion.

As an initial matter, the Report is based on clear and accessible data, including Ruiz's responses to a questionnaire, Ruiz's W-2s from 2018-2023, publicly available government data, and scholarly research—all of which Stokes disclosed throughout the Report. (Doc. 56 at 53-62.) In each section of the Report, Stokes also explains his methodological approach. (*Id.*) By disclosing his methodology and the data on which his analysis relies, Stokes's calculations may be retested, refined, and challenged. This ability to be tested—also known as falsifiability—is a hallmark of the scientific method and a factor that courts may consider in testing for reliability. *Daubert,* 509 U.S. at 593-94; *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) ("[S]cientific methods that are subject to 'further testing and refinement' may be generally accepted and sufficiently reliable.").

Additionally, the Court is sufficiently convinced that Stokes's methods are "generally accepted in the scientific community." The record indicates that Stokes devised his methods in compliance with NAFE, a professional standards-setting organization for forensic economists (Doc. 56 at 22), and Magellan nowhere contests this fact.

Notwithstanding these reliability-promoting features of Stokes's approach, Magellan argues that Stokes's approach is unreliable because he failed to adhere to his own assumption by not lowering Ruiz's projected wages closer to retirement. Although an expert's "failure to follow his own general practice" is a methodological flaw that may provide a basis for exclusion, *Junk v. Terminix Int'l Co.*, 628 F.3d 439 (8th Cir. 2010), the Court is not persuaded that Stokes engaged in such a failure here. Stokes merely stated that a late-career decrease in earnings "often tends" to occur but that this tendency "is

affected by a worker's age, sex and level of educational attainment." (Doc. 56 at 55.) Given these caveats and qualifications, there was nothing inherently contradictory and unreliable in Stokes's decision to assume that Ruiz's earnings would not decrease over time. At any rate, an expert's reliance on a mistaken assumption should ordinarily be addressed through vigorous cross-examination, not through exclusion. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

For similar reasons, exclusion is not warranted based on Magellan's contention that Stokes relied on other "unreliable assumptions." As an initial matter, Stokes's decision to use industry averages of similarly situated persons to quantify Ruiz's projected health and retirement benefits, instead of basing the calculation on Ruiz's actual health and retirement benefits, is not clearly unreliable. Magellan offers no authority suggesting that such an assumption is *per se* unreliable. More important, neither this criticism nor any of the remaining criticisms demonstrate that Stokes's opinion is so unreliable as to be inadmissible. All of the remaining criticisms—that Stokes improperly calculated Ruiz's projected Social Security benefits, that Stokes failed to consider the current "cap" on Social Security taxes, that Stokes improperly included 1.45% of earnings for Medicare taxes as a "fringe benefit"—would, if true, mean that Stokes's calculated number would need to be reduced. But "[t]he possibility that Stokes's calculated damages figure may need to be reduced, because it is based on an inaccurate assumption, is not a reason to categorically exclude Stokes from testifying." *Knorr v. Daisy Mountain Fire Dist.*, 2024 WL 4227693, *7 (D. Ariz. 2024). *See also Cnty. of Maricopa v. Off. Depot Inc.*, 2019 WL 5066808, *22 (D. Ariz. 2019) ("Although the Court is troubled by the errors, which Office Depot dramatically illustrated during the hearing, the Court is not convinced they were so pervasive as to render Ratliff's methodology unreliable as a matter of law."); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 2014 WL 12621218, *1 (M.D. Fla. 2014) (drawing a distinction between "an expert's unquestioned ability to render an opinion based on assumed facts and an opposing party's ability to factually disprove the expert's factual

assumptions" and emphasizing that "[t]he prospect that the opposition might disprove assumed facts . . . presents no barrier to the admissibility of an expert's opinion").

Accordingly,

**IT IS ORDERED** that:

1. Magellan's motion to exclude the expert testimony of Michael Stokes (Doc. 56) is **denied**.

2. The lawyers shall confer (among themselves and with their respective clients and witnesses) and, by July 24, 2025, file a joint notice indicating an estimated length of trial. In the joint notice, the parties shall also propose at least three dates on which they and their witnesses will be available to begin trial in or after December 2025.

Dated this 10th day of July, 2025.

Dominic W. Lanza
United States District Judge